IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiffs,<br><br>vs.<br><br>RICHARD GONZALEZ,<br><br>      Defendant. | **4:23CR3051**<br><br>**DETENTION ORDER** |
| UNITED STATES OF AMERICA,<br><br>      Plaintiffs,<br><br>vs.<br><br>RICHARD GONZALEZ,<br><br>      Defendant. | **4:23CR3052** |

Following the defendant's arraignment, the government moved for Defendant's detention, stating Defendant's release would pose a risk of harm to the public, nonappearance, and obstruction of justice. Based on the grand jury's findings, the court concluded Defendant's release would pose a serious risk of obstruction or attempted obstruction of justice, and of actual or attempted intimidation of witnesses. The court convened a hearing on the government's motion for detention. See 18 U.S.C. 3142(f)(2). Defendant was represented by his retained counsel, and he was afforded the opportunity to cross-examine the government's witness, call his own witnesses, proffer information, and testify himself if he chose to do so. After considering the information presented, the court finds the defendant must be detained pending trial.

A pretrial services report outlining Defendant's history and characteristics was prepared and received by the court. See 18 U.S.C. § 3142(g)(3). Based on that report, Defendant is 55 years old, was born in Omaha, and has lived in Omaha his entire life. His wife works in Omaha, and he visits his parents in the Omaha area daily. Defendant is retired from the Omaha Police Department. He owns firearms, but he will have them removed from his home if released. He has no physical or mental health issues, is not addicted to drugs or alcohol, and has no criminal record. He has a passport, but he is willing to turn it over to Pretrial Services, if released.

In addition to the information provided by pretrial services, the court must consider the nature and seriousness of the crime charged, the weight of the government's evidence, any facts indicating a risk of flight or obstruction of justice, and the nature and seriousness of the danger to the community or any person if the defendant is released. 18 U.S.C. § 3142(g)(1-2). The government presented substantial evidence on these issues. Based on the wire taps of record, the context of which was explained by the government's testifying agent, the court finds the following for the purposes of this detention hearing only:

Defendant is a retired police officer and has been the subject of prior FBI investigations for illegal drug activity. Court Ex. 1, at pp. 35-36, 120. He advised the subject of a drug investigation to change his phone number because it was the target of a wiretap, and he shut down the interview of an arrestee when the statements began implicating that drug dealer. The DEA was unable to find a recording or notes for that interview, and money was missing from the traffic stop seizure. He recommended that LPOA contract with Jack Olson for fund-raising, knowing that Olson had an opiate addiction and was previously terminated by multiple fundraising organizations. Court Ex. 1, at p. 64. He also knew Jack Olson was using the alias Cody Jones when fundraising for the LPOA, and that

2

Olson was personally receiving 80% of all donations he solicited for LPOA. Court Ex. 1, at p. 60.

Defendant and Olson used the LPOA funds to drink and party, often at the Lemon Drop. Court Ex. 1, at p. 76. Defendant represented that he was a board member for the LPOA—the Chaplain—and he authorized expenditures on the LPOA's behalf. Court Ex. 1, at p. 77. But in reality, Defendant was not a Chaplain of the LPOA and had not been on the board since 2016. Court Ex. 1, at pp. 83-84. Nonetheless, when board members were attempting to respond to a subpoena served on LPOA, they had to go through Defendant and had trouble finding everything.

When codefendant Johnny Palermo was a passenger in a vehicle driven by an intoxicated driver, and fled from the scene after the accident, Defendant knew Johnny Palermo had been in the vehicle, but he told no one. Court Ex. 1, at p. 21. When codefendant Jack Olson was under investigation for rape, the initial investigating officers were assigned to Defendant's work location. Defendant reportedly received "word from our inside people" that the victim lied. According to Defendant, Olson was not questioned about the rape "because our inside person basically said there's nothing there." Court Ex. 1, at p. 108.

At some point, concerns were raised about inside information being leaked from Defendant's work location. The case was reassigned to a different location. About eight months after the alleged incident, a detective contacted Olson and asked for a DNA sample. Olson was being investigated for first degree sexual assault. Court Ex. 1, at p. 109. Olson turned to Defendant and Johnny Palermo for advice. Olson admitted he bit the alleged victim. Court Ex. 1, at p. 113. Nonetheless, Defendant advised Olson to state the sexual encounter was consensual because if you say was consensual, "they can't go off her shit, and

the DNA." Court Ex. 1, at p. 114. After Johnny Palermo received word that the police believed he was at the Lemon Bar, where Olson and the alleged victim met, on the night of the alleged rape, Defendant advised Johnny Palermo to deny being present, making it his word against any others. Court Ex. 1, at p. 119. Defendant voiced that he, Johnny Palermo, and Makoor were on an island and needed to protect each other. Court Ex. 1, at p. 120. At Defendant's suggestion, Olson got a new phone with none of his data transferred. As a result, Olson's phone had no incriminating information on it.

Defendant tacitly approved of providing ad space in an LPOA publication in exchange for sex. Court Ex. 1, at p. 65. He was pleased when Olson got Texas De Brazil gift cards as donations to LPOA, clearly anticipating using them in the future. He went on a trip to Denver, later lamenting that they had spent too much of LPOA's money on trips and drinking. Court Ex. 1, at p. 140. He, along with the codefendants and others, went on a trip to Las Vegas, using LPOA money to fund the trip. Court Ex. 1, at pp. 129-30, 135. Vincent Palermo went on the trip as well. Although Defendant knew Palermo was thereby violating his terms of supervised release, Defendant arranged to have Vincent Palermo attend and Defendant did not report Palermo's violation of probation. Court Ex. 1, at pp. 134-36, 147.

Defendant asked a LPOA board member for suggestions on how to remove information from a cell phone. Defendant still has significant contacts in law enforcement, and he has reached out to some of those contacts for this case. Defendant accurately named the witnesses scheduled to appear before the grand jury to provide testimony for the above-captioned cases.

Based on the foregoing facts of record, the court finds, by clear and convincing evidence, that Defendant's release would pose a serious risk of harm

4

to the public and obstruction of justice. Moreover, it is unlikely this defendant will follow conditions of release set forth in a court order.

The court has considered whether conditions of release, or a combination of such conditions, would sufficiently ameliorate the risk posed by Defendant's release. While restricting and/or monitoring the defendant's movements and prohibiting his access to other's funds may ameliorate the risk of harm to the public posed by Defendant's release, such restrictions will have little or no impact on the risk that Defendant will obstruct justice is released. Defendant used phone conversations to deter the investigation of a rape case and offer advice on how to deter any investigation. If released, Defendant could likewise gain access to a telephone, and perhaps email and social media, to contact witnesses and discourage them from cooperating with law enforcement and testifying. While the court could order that Defendant have no access to a phone, Defendant could nonetheless use others' phones or burner phones even when under the careful supervision of pretrial services. But Defendant's surreptitious conduct as described in this order provides little basis for trusting the Defendant to comply with a court order prohibiting his contact with codefendants and witnesses to coach or orchestrate their testimony.

The defendant asks the court to order release subject to 24/7 supervision within Defendant's home. This suggestion is onerous and simply not feasible for either the court or the Defendant and his family member custodians.

The court therefore finds, by clear and convincing evidence, that no conditions or combination of conditions of release would sufficiently lessen the risk of obstruction of justice posed by Defendant's release pending trial. Defendant will be detained.

Directions Regarding Detention

The defendant is committed to the custody of the Attorney General or a designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or held in custody pending appeal. The defendant must be afforded a reasonable opportunity to consult privately with defense counsel. On order of the United States Court or on request of an attorney for the Government, the person in charge of the corrections facility must deliver the defendant to the United States marshal for a court appearance.

Dated this 28th day of April, 2023.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge